[L. A. No. 13113. In Bank.—June 22, 1932.]

R. S. BLACK et al., Petitioners, v. INDUSTRIAL ACCI-DENT COMMISSION OF THE STATE OF CALI-FORNIA, CONSTITUTION INDEMNITY COMPANY OF PHILADELPHIA (a Corporation) et al., Respond-ents.

Lemuel P. Mathews, F. Britton McConnell and Robert De Wolf for Petitioners.

A. I. Townsend, George H. Moore, Hubert Starr, Claude F. Weingand and Reginald I. Bauder for Respondents.

SEAWELL, J.—Petitioner R. S. Black prays for an order annulling certain awards made against him by the In-dustrial Accident Commission in favor of Jimmie Johnston, co-petitioner herein, and also in favor of the dependents of

Douglas Holpa and Frank Smith. Johnston was badly injured and Holpa and Smith were killed by a powder explosion which occurred at a mine about which they were working as employees of Black. The dependents of Holpa and Smith appear by separate petitions, L. A. No. 13112, but as the complaints of all the parties arise out of the same industrial casualty they will be considered together. R. S. Black, the employer, prays for an annulment of all of said awards on the ground that the Commission erroneously adjudged that he was not insured, and therefore his liability to each employee was a personal liability. This issue will be considered latterly. ■ Neither Jimmie Johnston nor the dependents of Holpa and Smith make complaint as to the amount of the respective awards, but each does attack that part of the respective findings and orders which find that none of the respondent insurance companies were the insurance carriers of the employer Black, and therefore directs that said respondents be discharged from liability.

The background and history of the casualties are briefly told. The Ballarat mine is located some ninety miles from Barstow, in a mining district, and twenty-five miles distant from Trona, the nearest hamlet. It is owned by the Ballarat Mining Corporation. Three ladies, Mrs. Hart, Mrs. Thompson and Miss Thompson, appear to have been the owners of the majority, if not all of the stock of the corporation. Mr. Black was a contractor engaged in doing road and mining assessment work, and resided at Clifton, Arizona. He contracted with said ladies to do assessment and road work at the mine. He brought with him from Arizona, Jimmie Johnston, Douglas Holpa and Frank Smith. The last-named two were Apache Indians who were wards of the government, living at the San Carlos Indian Reservation. They had worked for him before in Arizona. J. B. Kitch, superintendent of the San Carlos Indian Reservation, was present at the hearing representing the interest of the dependents of said wards. The crew of men Black was to assemble to do the work numbered about thirty, and the job was estimated to require approximately thirty days to complete it.

Respondents Constitution Indemnity Company of Philadelphia, Pacific Indemnity Company and American Mine Owners' Casualty Corporation are all corporations engaged

in writing contracts insuring against liability for compensation, as provided by the Workmen's Compensation, Insurance and Safety Act of this state, with offices in the city of Los Angeles. The Barstow Finance and Investment Corporation, doing business at Barstow, is the accredited agent of said Constitution Indemnity Company. Michael J. Ochoa is the manager of said Barstow Finance and Investment Corporation.

Swett and Crawford are the general agents of the Pacific Indemnity Company. Both occupy offices at 621 South Hope Street, city of Los Angeles, and are on the same telephone exchange. The Pacific Indemnity Company pays the office rent of Swett and Crawford. M. J. Johnson, vice-president of the Pacific Indemnity Company, was in charge of its offices. William F. Gaynor was manager, and L. Clyde Paine was in charge of the casualty underwriting department of Swett and Crawford, a subsidiary of the Pacific Indemnity Company. Compton Johnson was an underwriter in the employ of Swett and Crawford. What connection or working agreement the American Mine Owners' Casualty Corporation had with the other allied insurance companies cannot be satisfactorily determined from the record. It is left in a vague and uncertain state. Each insurance company and party in interest was represented at the hearing by at least one attorney, while Black, who appeared to have no knowledge as to the law or procedure, and who was most in need of an attorney to protect rights involved in a technical branch of the law, was without the aid of counsel. It is very apparent from an inspection of the record that he suffered from the want of advice and assistance of counsel, both in the preparation and presentation of his case. He sat mute during the proceeding, except when called as a witness by his adversaries.

It would seem that Swett and Crawford, who were connected with, if not subsidiary to the Pacific Indemnity Company, represented the American Mine Owners' Casualty Corporation in placing insurance. The interrelation of the Pacific Indemnity Company, the American Mine Owners' Corporation, Swett and Crawford, and Paine and Compton, underwriters, all of whom practically officed together, are so entwined and confused that it is practically impossible to separate their business participation in the transaction.

The Constitution Indemnity Company stands out in the proceeding as a definite entity. We are only interested in this proceeding as to whether any one of said companies was Black's insurance carrier, and not with any cross-demands that might exist between said companies growing out of agreements between themselves which could affect the right of one to recoup from the others.

Black, the employer, and Johnston, the injured employee, and the dependents of the deceased employees based their claim for a reversal on the erroneous finding that Black did not carry compensation insurance at the time the explosion occurred.

On June 26, 1930, Ochoa, the manager of the Barstow Finance and Investment Corporation, met Black in Barstow. Black had gone to Barstow upon the business of obtaining compensation insurance, as the owners of the mine required that he obtain coverage. He had considered going into Los Angeles, but Ochoa told him that it was unnecessary; that he could get the insurance from his company and save him the trip to Los Angeles. There are some divergences as to the conversations which occurred between Ochoa and Black, which ended with Black procuring a certified or cashier's check in the sum of $360 with the assistance of Mrs. Thompson and her daughter, owners of the mine, and delivering it to Ochoa in payment of the premium. These divergences are unimportant and do not raise any doubt as to the purposes and object of the Ochoa negotiations. Black tells a very natural story as to his negotiations with Ochoa. It was distinctly understood by Ochoa that Black and the mine owners who accompanied him to Barstow required immediate coverage. Work was to begin at the mine at once. Black testified that Ochoa made a memorandum of the kind of work that Black had contracted to perform. Ochoa took up the matter in accordance with his business custom, by phone, with the Los Angeles office. Mrs. Emily Dyer, an experienced employee in compensation insurance business, was in charge of the telephone information department for the Constitution Indemnity Company. Inasmuch as industrial accident insurance from its nature requires quick action, much of the business is transacted by the use of the telephone. She was invested with responsible duties.

That Mrs. Dyer was in a position of business authority cannot be questioned. Ochoa, in the presence of Black and Mrs. Thompson and her daughter, called up the Constitution Indemnity Company on the afternoon of June 26, 1930, and Mrs. Dyer responded for her company. Mr. Black heard Ochoa say to Mrs. Dyer that Black was to be covered at once; that it was a "rush job". At the conclusion of the conversation he told Black that the insurance would be granted provided he put up the amount of the premium, which was $350, evidenced by a certified check. The business was not finally concluded on Friday, the 26th, and Black remained in Barstow until the afternoon of the following day. Black and Mrs. Thompson and daughter were present when Ochoa talked with Mrs. Dyer on both occasions, but did not hear what she said. The postponement of negotiations with the Los Angeles office to the next day was made to give Mrs. Dyer time to give a final decision as to whether Mr. Black would be granted coverage. On the following day, June 27th, she called up Ochoa and at the conclusion of the conversation Ochoa said to Black that insurance would be procured provided he put up a certified check for $350. This he had prepared to do on the strength of what Ochoa had said on the day before. Mr. Ochoa's version of the transaction was that he met Mr. Black at about 3 o'clock on the afternoon of June 26th; that Ochoa told him that he had no application blanks and that he was not experienced in mining insurance, but that he would get in touch with his company and see what he could do. Mr. Black was accompanied by Mrs. Thompson and her daughter. Ochoa said that he had talked with Mrs. Dyer and she told him that the Constitution Indemnity Company was not handling mining insurance, which, to use his words, "I emphatically impressed upon Mr. Black and the ladies." (Mr. Black denies that Ochoa explained to him or mentioned to him anything about the Constitution Indemnity Company not handling mining insurance.) He said that while he was holding the line Mrs. Thompson said, "Well, I wonder if they can't place it for us somewhere else." Ochoa, continuing, said: "They seemed to be in a hurry and anxious to get the insurance as quickly as possible; as a matter of accommodation and in order to probably get some profit for the company, I asked Mrs. Dyer if she could possibly place the insurance with

someone else. She told me she did not know, but she would find out, and let me know later on; so I just hung up the phone . . . and in about thirty minutes Mrs. Dyer telephoned again; Mrs. Dyer says, 'I can place the insurance for him.' I said, 'All right, how much is the premium,' and I asked details of it and she told me what amount. I told Mr. Black and the ladies. I do remember one thing and that is Mr. Black was very anxious to know whether the insurance would take effect upon the delivery of the money, and Mrs. Dyer had explained there had to be a certified check for the amount, which was $350. I asked Mrs. Dyer if the insurance would take effect; she said, 'Yes.' So I so explained to Mr. Black and the thing was finished right there.''

Ochoa further testified that he did not recollect whether Mrs. Dyer told him the name of the company which was to write the insurance, but he said he was sure that she made the statement that the Constitution Indemnity Company could not take the insurance because they did not take mining insurance. It appears that that company did formerly accept mining insurance, but the claim was made by its officers that that line of insurance had latterly been discontinued. It is not claimed that the public had any knowledge on the subject. Asked as to what Mrs. Dyer said as to the time the insurance would become effective, his reply was, when the money was paid to him, Ochoa, in Barstow. On the afternoon of June 26th, the witness having heard from Mrs. Dyer, told Black that the Constitution Indemnity Company had been able to obtain the insurance somewhere and Black replied that he would give him the money. On the following day, Saturday, June 27th, Black, Ochoa, Mrs. Thompson and daughter went to the bank. Mr. Black wanted to make the check payable to Ochoa, but Ochoa said he did not wish him to do so, and suggested that he make it payable to the Constitution Indemnity Company, and it could indorse it and give it to the proper party, whoever issued the policy. Black, by mistake in procuring the check, had it made for $360 instead of $350. When Ochoa made remittance of the check to the Constitution Indemnity Company, he requested that it remit the $10 excess to Mr. Black at Trona.

Mrs. Emily Dyer testified that she was a clerk in the office of the Constitution Indemnity Company during June

of 1930, and her special duties were taking orders by means of the telephone in the underwriting department. She had been engaged in the insurance brokerage business for several years. Her employment with the Constitution Indemnity Company ceased August 1, 1930. She testified that Ochoa called her by phone on the 26th of June, and asked her if the company wrote mining insurance, and she replied that it did not take mines; mines were on the prohibited list. Ochoa asked her if she could place it, as he had a man who was going to work in a mine and he wanted coverage. She told him she did not know, as it was a very hard risk to place, and she would see what she could do. Ochoa told her that the insurance should cover thirty men for thirty days—fifteen of the men were to work in the mine. She called him back later, and said she had called up a number of companies which declined to accept mining risk, but lastly she called up the Pacific Indemnity Company, and Mr. Johnson, the vice-president, said his company did not accept mines, but "we have a company in our office, the American Mine Owners' Casualty Corporation, which does." She said to him, "Well, I have a risk for you." He replied, "We can't take it unless we have a certified check in our office for $350." He stipulated that a check for $350 certified must be in their office before coverage could take effect. She then called Mr. Ochoa and told him she had found a company that said it would take the risk, but a certified check in the sum of $350 must be in the office of the Pacific Indemnity Company (Mr. Johnson's company) before coverage would be effective. Ochoa, mindful of the urgency of action, inquired of Mrs. Dyer if the coverage would be effective upon the receipt of the check at the Barstow office of the Constitution Indemnity Company or at its Los Angeles office. Mrs. Dyer's best recollection was that she replied, "Well, Mr. Ochoa, all I can say is, they said they would take it."

Black delivered his certified check to Ochoa, payable to the Constitution Indemnity Company, and was given a receipt unambiguous and absolute in form into which was written, at the special instance of Mrs. Thompson, the precise hour the check was delivered. It reads as follows, omitting the caption:

"Barstow, Calif. June 27, 1930.

"Received of Mr. R. S. Black Three Hundred Sixty Dollars no/100 ($360.00) for workmen's compensation for 30 men at Ballarat, California. This amount is minimum deposit on policy to be delivered to Mr. R. S. Black upon its issuance at Los Angeles. It is understood that this workmen's compensation insurance for protection of the 30 men doing contract work for said Ballarat Mining Corporation takes effect upon delivery of certified or cashier's check hereby acknowledged.

"Dated at Barstow, Calif. June 27, 1930, 12:45 p. m.

"BARSTOW FINANCE AND INVESTMENT CORP.

"Barstow, Calif.

"M. V. OCHOA, Manager."

(Underscoring of "12:45" is ours.)

On the same day, two hours later, Ochoa sent the following telegram to the Constitution Indemnity Company at Los Angeles:

"Have certified check from R. S. Black Three Hundred Sixty Dollars deposit workmen compensation mailing tonight.

"BARSTOW FINANCE AND INVESTMENT CORPORATION."

Again on the same day he wrote and mailed the following letter:

"Barstow, California, June 27, 1930.

"Constitution Indemnity Co. of Philadelphia,

"Los Angeles, Calif.

"Gentlemen:

"According to our telephonic conversation and my telegram of even date, I am enclosing certified check No. 1 from Mr. R. S. Black, amounting to $360 (Three Hundred Sixty and no/100) to cover minimum premium on workmen's compensation insurance which you advised you were able to place for Mr. Black, as per date I gave you over the telephone. I am enclosing *copy of the receipt* given by us to Mr. Black. Due to an error, Mr. Black made the check for $360.00, instead of $350.00, and we will appreciate if you will kindly return the $10.00 to Mr. Black direct to Trona,

Calif. Also please mail *us check for our commission on this deal,* obliging,

"Yours truly,
"BARSTOW FINANCE AND INVESTMENT CORPORATION
"Per: M. V. OCHOA."

(Italics supplied.)

It will be noticed that the ample receipt, which contained the elements of a contract within itself, also contained many of the· details furnished by Black to Ochoa as to the kind of and place of employment, number of men to be covered, amount of premium, and the exact time of payment. This receipt was brought to the *direct* attention of the Los Angeles and San Francisco offices. The $360 check was cashed by the Constitution Indemnity main office and the proceeds were disposed of pursuant to its own plan.

With the foregoing assurance that he had received coverage, Mr. Black returned to the mine and his employees were set to work. Three days thereafter, to wit, June 30th, the explosion occurred, with the result already described. On the following day, July 1st, Black telegraphed from Trona to Barstow Finance and Investment Corporation, as follows:

"Have accident to report wire name of company that carries my compensation give to me by you June Twenty-seventh.

"R. S. BLACK."

On July 2d Barstow Finance and Investment Corporation sent the following wire to the Constitution Indemnity Company:

"Have telegram from R. S. Black. Reads: 'Have accident to report. Wire name company carrying my compensation arranged June twenty-seventh.' Wire information desired to Black, Trona, Calif."

In reply to Black's first inquiry the Barstow Finance and Investment Corporation sent to him the following telegram:

"Have wired Los Angeles requesting give you information desired. Address further inquiries or reports E. Dyer Constitution Indemnity Company of Philadelphia, 314 West Ninth Street, Los Angeles."

On the same day Black sent another telegram to the Barstow office as follows:

"Wire immediately collect name of company carrying my workmen's compensation insurance," to which the Barstow agency replied:

"Don't know name of company. Have asked Los Angeles to wire you name."

Black, in compliance with the Barstow agent's instructions to consult the Los Angeles office, immediately sent to Mrs. E. Dyer the following telegram:

"Wire me name of company carrying my workmen's compensation insurance. Also state what disposition was made of my policy."

He received from said office the following telegram of inquiry:

"If accident serious telephone report Vandyke seven eight nine two. Constitution Indemnity."

When Black went to the bank to procure his certified check he made inquiry at the bank concerning the Constitution Indemnity Company.

If the foregoing facts, which rest almost entirely upon written documents consisting of letters, receipts and telegrams, do not constitute a contract of insurance between the Constitution Indemnity Company and Black, as a matter of law, it would be difficult to explain the meaning of the long list of cases which hold that a contract may be proved by this method. The liability of the Constitution Indemnity Company is shown independent of the parol testimony. As a matter of fact the portions of the parol testimony which comport with reasonable probability as to what the conduct of the parties engaged in such a transaction would have been, tend strongly to corroborate the written evidence.

Whether the Constitution Indemnity Company intended to place the insurance with some other company is of no consequence in the light of the fact that it took the matter of indemnity insurance into its own hands, and accepted the premium, and assured Black that he was covered. Neither does it matter that it had as a part of its business policy decided not to take mining risks. No such prohibition was contained in its written contract with its Barstow agent. It had the authority to write such insurance and it could have done so if it desired. It was engaged in general compensation insurance, and if it had elected not to further include this class of insurance in its risks it should have refused to

entertain the proposition *ab initio*. Instead said company undertook to furnish the coverage sought. It fixed the premium at $350 for coverage of thirty men for thirty days, only fifteen of whom were to engage in mining work. This sum amounted to $11.66 for each man employed on the job, or $11 per day for the entire crew. Not only did the Constitution Indemnity Company accept Black's money and carry him along until it was too late for him to protect himself against the hazard, as provided by the Industrial Accident Act, but it caused him and the owners of the mine to believe that he was protected by insurance. The transaction so strongly bore the aspect of business regularity that the Barstow Finance and Investment Corporation asked its principal for its share of the commissions arising out of the insurance transaction. (See Ochoa letter, dated June 27, 1930, to Constitution Indemnity Company.)

The written evidence, which is sufficient to establish the contract, is not shaken by the oral testimony as to the conduct of the officers and employees of the three insurance companies in their efforts to avoid liability after it had become known that the accident had occurred. Aside from the inherent improbabilities of much of the parol evidence offered to rebut the plain import of written documents, the testimony given by Black finds corroboration in certain material portions of the testimony of his adversaries, and it is corroborated by incontrovertible proven facts. There is nothing startlingly strange, in the circumstances which counsel stress, that Black, who was a stranger in California and who seemed not to be a man of wide business experience or information, should have been unable to recall, in the stress of his sudden misfortune, the name of the company that had guaranteed him against loss occasioned by industrial hazards. These incontrovertible facts cannot be laid out of the case: First, that Black would have had the check made in favor of Ochoa, but that Ochoa himself, as he testified, instructed him to make it payable to the order of the Constitution Indemnity Company; secondly, Ochoa accepted it as thus made out, and so did his principal. Neither would it have defeated Black's claim, in the light of subsequent facts developed by the evidence, if the check had been signed in blank and Black had not known at the moment who the insurer was to be. Black wanted coverage.

He had no interest in insurance companies except as to the extent of financial responsibility. The entire matter was handled by the Constitution Indemnity Company through its authorized officers, and they led him and the mine owners to believe, as they were told, that when Black drew his check in favor of the Constitution Indemnity Company they were protected. Any other reasonably prudent person would have been similarly deceived.

On July 3d, three days after the accident and two days after it had been reported to the Constitution Indemnity Company, Mrs. Dyer, in charge, who had been negotiating with both Pacific Indemnity Company and with the American Mine Owners' Casualty Corporation, both of which, according to Mrs. Dyer, had agreed to issue a policy of coverage, sent the following wire to Black:

"Swett and Crawford will not accept compensation coverage. However, they are making an inspection Monday. Suggest you report accident to them immediately, Pacific Finance Building, Los Angeles so as to have claim on record." To this telegram Black answered that he had had no dealings with Swett and Crawford. He also stated that he had ordered his men to stop work, and asked if the company had canceled his policy. If so, he demanded a return of his money. Beyond a reasonable doubt, both the Pacific Indemnity Company and the American Mine Owners' Casualty Corporation, through Swett and Crawford, as well as L. C. Paine and C. Johnson, underwriters, had knowledge of the explosion before the above telegram was sent. Mrs. Dyer admittedly had received such knowledge at least two days prior thereto. That the others had such knowledge is shown by their refusing to complete their negotiations with the Constitution Indemnity Company to take the matter over after they had gone as far as to accept from the Constitution Indemnity Company the amount of the Black check. The sudden change of attitude and the preparation made to escape liability on the part of the Pacific Indemnity Company and the American Mine Owners' Casualty Corporation, can be explained on no other rational theory than that they had received knowledge of the occurrence of a casualty which threatened to involve them in an indemnity loss.

We will not pursue further the open question existing between the Constitution Indemnity Company on the one side and the Pacific Indemnity Company and the American Mine Owners' Casualty Corporation on the other, as to whether or not the first-named company may maintain an action against both of the latter companies or against either of them for damages arising out of their participation in the transaction, as that controversy may properly be determined in a suitable forum. That substantial grounds exist in favor of the Constitution Indemnity Company cannot be doubted, but it is sufficient for this proceeding to determine the question as to who was the primary insurer of petitioner Black. The letter and the receipt for the paid premium sent by Ochoa to the Constitution Indemnity Company on June 27th and heretofore set out, are sufficient without resorting to much other convincing evidence to establish a contract of insurance. Said letter and receipt without question received the sanction and indorsement of the company. Either was sufficient in form and substance to constitute a cover note, the office of which is correctly stated in 14 California Jurisprudence, page 430, as follows:

"It is not uncommon for an insurer to issue a cover note, binding slip, certificate or memorandum of insurance which may answer the purpose of a more formal policy or operate as a temporary expedient until the policy itself can be issued. Such an instrument does not constitute a policy of insurance as that term is generally understood, but usually presupposes the issuance of a policy and puts the insured upon inquiry to ascertain the terms of the policy in order to determine his rights thereunder. It has long been established that a cover note is a present contract of insurance." (Citing many authorities; see, also, 32 Cor. Jur., p. 1099.)

That portion of the Industrial Accident Commission's order dismissing the Constitution Indemnity Company from the proceedings and discharging and releasing it from liability is annulled and vacated. As to the amounts of the awards and the persons in whose favor they were respectively made, no serious contention is made, and said awards as to amounts and persons will therefore remain undisturbed. That portion of the findings and order which ex-

empts said Constitution Indemnity Company from liability is by this order annulled. It is so ordered.

Curtis, J., Langdon, J., Preston, J., Tyler, J., *pro tem.*, Shenk, J., and Waste, C. J., concurred.

Rehearing denied.